OVERSEAS MOTORS, INC., a Michigan Corporation, Plaintiff-Appellant,

v.

IMPORT MOTORS LIMITED, INC., a Michigan Corporation, et al., Defendants-Appellees.

OVERSEAS MOTORS, INC., a Michigan Corporation, Plaintiff-Appellant,

v.

IMPORT MOTORS LIMITED, INC., a Michigan Corporation, et al., Defendants-Appellees.

Nos. 72-2198 and 74-1651.

United States Court of Appeals, Sixth Circuit.

June 2, 1975.

Certiorari Denied Nov. 17, 1975.

See 96 S.Ct. 395.

Wilfrid L. Burke, Burke & Wilson, Detroit, Mich., for plaintiff-appellant in both cases.

Bert Burgoyne, Harry M. Nayer, Travis, Warren, Nayer & Burgoyne, Detroit, Mich., for Volkswagen of America.

John A. Young, Ernest C. Stiefel, New York City, Gordon J. Quist, Miller, Johnson, Snell & Cummiskey, Grand Rapids, Mich., George E. Bushnell, Jr., Gregory L. Curtner, Detroit, Mich., Herbert Rubin, Herzfeld & Rubin, New York City, Miller, Canfield, Paddock & Stone, Detroit, Mich., for defendants-appellees in both cases.

Before LIVELY and ENGEL, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

ENGEL, Circuit Judge.

This is an action by Overseas Motors, Inc. (Overseas) against Audi NSU Auto Union Aktiengesellschaft (ANAU), Volkswagenwerk Aktiengesellschaft (Volkswagen), Volkswagen of America (VOA), and Import Motors Limited, Inc. (Import), alleging violations of Sections 1

and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (Count I), Section 7 of the Clayton Act, 15 U.S.C. § 18 (Count II), and the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 et seq. (Count III). The district judge, after five weeks of trial, granted defendants' motion for a directed verdict on all counts. We affirm.

Overseas is a Michigan corporation which was the distributor of NSU automobiles in an eleven state area. ANAU, a German corporation, is the successor to NSU Motorenwerke Aktiengesellschaft which manufactured NSU automobiles, and Auto Union Gmbh, manufacturer of Audi automobiles. The corporations merged in 1969.

Volkswagen, a German corporation, is the manufacturer of Volkswagen and Porsche automobiles. It also controls 99% of the outstanding stock of ANAU. VOA is a wholly owned subsidiary of Volkswagen whose sole function is the importation and distribution of Volkswagen, Porsche and Audi cars in the United States. Import distributes Volkswagen, Porsche and Audi cars in several midwestern states, but unlike VOA, is independently owned and operated.

In 1968 Overseas entered into an importer contract with the predecessor of ANAU for exclusive rights to sell NSU cars in ten (later eleven) states. The significant provisions of the importer contract included an arbitration agreement calling for all disputes arising under the contract to be decided by an arbitration court in Zurich, Switzerland, a provision making the contract terminable by either party at the end of any calendar year upon giving three months' advance notice, and an exclusivity provision requiring that Overseas deal only in NSU products.

Overseas obtained numerous dealers throughout the franchise area in anticipation of the car sales to be generated by the enterprise. It also carried out training programs, advertised extensively, and cooperated with ANAU in helping it qualify NSU autos under American safety and emissions standards. In late 1970, deliveries of NSU autos to Overseas which had previously been insufficient to meet Overseas' orders, ceased entirely.

On July 15, 1970, approximately a year after the merger of NSU and Audi, ANAU notified Overseas by letter that it wished to take up negotiations with its American importers concerning termination of the importer contracts. Its expressed intent was to find a ". . . viable and fair solution in all cases." ANAU proposed that the importers be compensated either through inclusion in the Volkswagen distribution network, or by payment of a remuneration for the giving up of import rights.

In April 1971 ANAU sent a second letter to Overseas informing the company that while it was voluntarily extending Overseas' importer contract until December 31, 1973, the franchise would be terminated on that date. Pointing out that the American market for NSU automobiles had not developed ". . . anywhere nearly as well as both you and we had hoped when we made our agreement of July 1, 1968 . . ." ANAU claimed that American safety and exhaust standards had made it increasingly difficult to supply NSU cars at reasonable cost, in consequence of which it had cut its American line back to one model only, the NSU 1200C. In the letter ANAU, which had previously released Overseas from the exclusivity provisions of the franchise agreement, also consented to Overseas' termination of the contract at any time upon giving three months' notice.

ANAU and Overseas entered into negotiations concerning termination of the importer contract in which the possibility of Overseas obtaining a Porsche-Audi dealer's franchise was discussed. Overseas applied through Import to VOA for such a franchise, but final approval of the application was refused. The settlement negotiations failed to produce any other agreement between the parties.

Overseas commenced this suit in April, 1972 and shortly thereafter ANAU gave notice that it intended to submit the ter-

mination grievance to arbitration as provided by the importer contract. A motion to stay reference of the grievance to arbitration was denied by Judge Feikens, and on November 24, 1972 ANAU submitted the matter to the Swiss arbitration court. Overseas' separate appeal from the denial of its motion for stay has been consolidated with its appeal from the judgment on the merits.

The principal issue is whether the evidence, with permissible inferences to be drawn therefrom, was sufficient to require submission of any of Overseas' claims to the jury on any of the theories of recovery embodied in the complaint. Subissues are whether the district judge erred in his determination of the extent to which certain findings of the Swiss court were binding upon the plaintiff in the district court action under the doctrine of collateral estoppel, and whether the judge erred in excluding evidence of the negotiations conducted for settlement of the dispute.

The comprehensive opinion of District Judge John Feikens is set forth at 375 F.Supp. 499 (E.D.Mich.1974).

Appellate review of the action of a district court in granting a motion for directed verdict demands the most painstaking review of the evidence to make certain that what is claimed not to be there, in fact, isn't.

"To determine whether a directed verdict is appropriate the governing principle is that a verdict may properly be directed only when, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict . . . An appellate court too is bound to view the evidence in the light most favorable to the party against whom the motion for a directed verdict is made and give him the advantage of every fair and reasonable inference that the evidence may justify." *Fortner Enterprises, Inc.* v. *United States Steel Corp.,* 452 F.2d 1095 (6th Cir. 1971)."

Overseas' principal antitrust claim was that the defendants conspired to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1[1] by "pinching off" its supply of cars, thus forcing Overseas out of business as an importer and distributor of NSU automobiles. The district court held that Overseas had failed to prove either element of the Sherman Act offense, namely (1) a contract, combination or conspiracy which resulted in (2) an unreasonable restraint of trade.

Overseas attempted to establish the conspiracy by use of circumstantial evidence which it claimed created a permissible inference of collusion among the defendants. The district judge analyzed this evidence in terms of three categories of acceptable ways to prove conspiracy by circumstantial evidence: motive, opportunity and consistency of overt acts. He determined that the evidence was insufficient to establish an inference of conspiracy and survive the motion for directed verdict. Similarly, Judge Feikens analyzed Overseas' claim of restraint of trade in terms of conduct which would be *per se* illegal under the Act and conduct which would be unreasonable under the "rule of reason", *Standard Oil Co.* v. *United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). The court found that the proofs offered totally failed to establish the requisite restraint of trade under either of these theories. Count I also alleged a violation of § 2 of the Sherman Act, 15 U.S.C. § 2.[2] Judge Feikens ruled that

1. 15 U.S.C. § 1 provides in part:

   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal:

2. 15 U.S.C. § 2 provides:

   Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

the claims of monopoly and of attempt to monopolize failed for lack of proof of relevant market and proof of specific intent to monopolize.[3]

Overseas alleged in Count II that "the merger of Audi and VW in July, 1970, . . . resulted in substantially lessening competition and tended to create a monopoly" in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.[4] The trial judge held that this claim failed altogether for want of any proof as to relevant market. Overseas has not contested this finding on appeal.

■ A careful review of the record demonstrates that Overseas' antitrust issues were never clearly articulated and we have little to add to the extensive discussion of the evidence made by the district judge in his memorandum opinion. Our examination of the evidence compels us to conclude, as did Judge Feikens, that plaintiff has totally failed in its proofs on the key elements of its antitrust claims:

> The overwhelming reality which emerges from the many weeks of testimony and the hundreds of exhibits in this case is the total failure of the plaintiff to even address many of the central questions raised by the law it has invoked, and its complete lack of concrete evidence as to those elements with which it has concerned itself. 375 F.Supp. at 544.

■ Plaintiff claims it was precluded from effectively presenting evidence in support of his antitrust claims because of the application of the doctrine of collateral estoppel by the district judge to make binding certain findings of the Swiss arbitration court. In addition, it claims the district judge improperly excluded certain evidence of the settlement negotiations between Overseas and ANAU which purportedly linked VOA and Import to the conspiracy to drive Overseas out of business.

The narrow application of collateral estoppel principles to the findings of the Swiss court could not in any event be said to have affected the outcome since the facts so found were largely undisputed and were apparent on the face of the record. For purposes of ruling upon the motion for directed verdict, the district judge considered the proffered settlement evidence even though he was convinced it was inadmissible. We have also considered this evidence and conclude that its admission would not change the result here.

Overseas' third claim, embodied in Count III of the complaint, is that ANAU violated the Automobile Dealers Day in Court Act, 15 U.S.C. § 1221 et seq., by attempting to coerce Overseas into terminating its franchise agreement earlier than the December 31, 1973 date which it had voluntarily set in its letter of April 15, 1971.

■ 15 U.S.C. § 1222[5] allows an automobile dealer a cause of action against a manufacturer where the manufacturer has failed to act in "good faith" in per-

---

3. Overseas does not appear to have seriously pressed its claim of a Section 2 violation at trial. The case was tried essentially on a conspiracy theory, and Judge Feikens limited his discussion of Overseas' Section 2 claims to a footnote in his opinion. Overseas' complaint, for example, does not even state which of the defendants it claims was a monopolist or attempted to monopolize.

4. In actuality, the merger was between NSU and Porsche-Audi. Volkswagen ultimately acquired 99% of the outstanding stock of the new corporation, ANAU.

5. 15 U.S.C. § 1222 provides:

An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided*, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

forming any of the terms or provisions of the franchise, or in terminating or not renewing the franchise with such dealer. "Good faith" is given a quite restrictive definition in 15 U.S.C. § 1221(e),[6] however. In order to fail to act in good faith, a manufacturer must act in such a way as to coerce, intimidate, or threaten to coerce the dealer. Several types of coercion are alleged. First, Overseas claims that ANAU attempted to coerce termination by increasing prices on the vehicles to such an extent that they were commercially noncompetitive. While there was evidence to support the claim that prices were increased, there was no evidence to support the claim that the prices were increased for any other reason than that given by ANAU: increasing difficulty in producing NSU in small volume while at the same time complying with American safety and exhaust requirements. There was no evidence at all to support any claim of price discrimination among American distributors.

Overseas' theory that ANAU "pinched off" deliveries of NSU autos to induce an early termination of the franchise must be understood in the framework of the contractual relations of the parties. Section 12(1) of the importer contract provides in part:

"This contract comes into force on the first day of July, 1968. Either party to this contract may terminate this contract with three months' notice as of the end of any calendar year, initially as of December 31, 1969."

Thus, when ANAU wrote its April 15, 1971 letter to Overseas it was fully empowered to terminate the agreement effective December 31, 1971 under § 12(1) of the agreement. No coercion was needed to achieve this end if termination was desired. Instead a two-year extension of the contract was granted and the requirements of § 12(1) were waived to permit Overseas to terminate at any time simply upon giving three months' notice. The April 15, 1971 letter then looked to the termination of the relationship of the parties and the two year extension of the agreement appears primarily to have been an accommodation to Overseas to permit it adequate time to acquire a new distributorship.

In applying the definition of "good faith" contained in 15 U.S.C. § 1221(e), it is necessary to consider not only whether the manufacturer brought pressure on the dealer, but also his reason for doing so. *Rea v. Ford Motor Co.*, 497 F.2d 577 (3rd Cir. 1974). Here there was no evidence to suggest any reason why ANAU would have wanted or needed to use coercion to force Overseas to terminate the importer contract. As stated by the district judge:

ANAU was not obligated to deliver cars to plaintiff even while the contract was in force, and in any event the contract was terminable at will on relatively short notice. No elaborate conspiracy such as plaintiff alleges was necessary to secure termination of the contract or effect a withdrawal of NSU products from the American market.

. . . The defendants were free to make whatever arrangements they wished for its importation and distribution in this country, and whatever rights plaintiff may have had in the NSU product line were irrelevant. The only conceivable motive for forcing plaintiff to abandon its exclusive distributorship would have been a desire to transfer the right to import and distribute NSU cars within its territory of someone else (presumably VWOA and Import). However, in

---

**6.** 15 U.S.C. § 1221(e) provides:

(e) The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

view of the undisputed fact that the NSU product line has been withdrawn from the American market, the right to distribute it has become totally meaningless.[7]  375 F.Supp. at 533.

Overseas also introduced extensive evidence concerning the Ro–80 automobile which was to be produced as part of the NSU line. . The Ro–80, powered by a Wankel motor, was described by ANAU as a revolutionary automobile with tremendous sales potential in the United States market. There was evidence that Overseas had been led to believe that it would be involved in the distribution of the Ro–80 in this country and it is undisputed that the automobile has never been marketed in the United States. Overseas claims that the Ro–80 was withheld in bad faith from the American market, although the district court found no evidentiary basis for such a conclusion.

■  Even assuming that Overseas is correct and that there was evidence to support a jury finding that ANAU had withheld the Ro–80 from the United States market in "bad faith" as that term is normally understood, Overseas would still not be entitled to recover under the Act because of the specialized definition which the Act accords to "good faith".

Overseas' contentions that the termination violated the Act has at least some support in the legislative history of the Act. It is true that Congress was concerned with the arbitrary terminations of dealer franchises which had occurred under old franchise contracts:

> This bill assures the dealer an opportunity to secure a judicial determination, irrespective of the contract terms, as to whether the automobile manufacturer has failed to act in good faith in performing or complying with any of the provisions of his franchise or in terminating, canceling, or not renewing his franchise.

H.R.Rep.No.2580, 85th Cong., 2d Sess. (1956), 3 U.S.Code Cong. and Admin. News, 1956, p. 4600.

A similar concern can be found in the expressed disapproval of earlier cases which refused to read into dealer franchises a requirement of good faith as a condition to termination of the agreement by the automobile manufacturer. See 3 U.S.Code Cong. and Admin.News (1956), *supra*, at 4599, citing particularly *Bushwick-Decatur Motors, Inc.* v. *Ford Motor Co.*, 116 F.2d 675 (2nd Cir. 1940) and *Buggs* v. *Ford Motor Co.*, 113 F.2d 618 (7th Cir. 1940).

■  The broader intention expressed in the House Report is at odds, however, with the express language finally incorporated in the Act, and the rather specialized definition of good faith in the statute must control, notwithstanding the conflicting language in the House Report. The cases have uniformly held that evidence of coercion or intimidation is necessary to a showing of lack of good faith under the statute, and a mere showing of arbitrary or other bad faith conduct absent coercion is not a sufficient ground for recovery under the Act. *Berry Bros. Buick, Inc.* v. *General Motors Corp.*, 257 F.Supp. 542 (E.D.Pa. 1966), *aff'd*, 377 F.2d 552 (3rd Cir. 1967); *R.A.C. Motors, Inc.* v. *World-Wide Volkswagen Corp.*, 314 F.Supp. 681 (D.N.J. 1970); *Unionvale Sales Limited* v. *World-Wide Volkswagen Corp.*, 299 F.Supp. 1365 (S.D.N.Y.1969). This circuit has ruled that under Section 1222 the absence of good faith as defined in Section 1221(e) is literally construed. Evidence of coercive conduct is an essential element of any cause of action under the Act. *Frank Chevrolet Co.* v. *General Motors Corp.*, 304 F.Supp. 307 (N.D.Ohio 1968), *aff'd*, 419 F.2d 1054 (6th Cir. 1969).

We are not here concerned about ANAU's liability for breach of contract. That cause of action was not pleaded

---

**7.** Judge Feikens was commenting upon the lack of any motive for the alleged conspiracy between ANAU and the other defendants. However, we think this evidence also shows lack of motive for the type of coercion which Overseas claims was used.

here, nor could it in view of the arbitration provision. Our concern, therefore, is solely with any statutory liability imposed by 15 U.S.C. § 1221 *et seq.*

Here Overseas has failed to introduce any evidence of coercion or intimidation in connection with ANAU's conduct concerning the Ro–80. While Overseas' evidence may have created an inference of bad faith not involving coercion, this was insufficient to send the statutory claim to the jury.

The order of the district court in 72–2198 and the judgment of the district court in 74–1651 are affirmed.

Costs to appellees.