George W. SINK and Sink Ford, Inc., a Michigan corporation, Plaintiffs,

v.

FORD MOTOR COMPANY, a Delaware corporation, Defendant.

Civ. A. No. 80–70008.

United States District Court,
E.D. Michigan, S.D.

Oct. 7, 1982.

Grady Avant, Jr., Detroit, Mich., for plaintiffs.

William A. Zolbert, Dearborn, Mich., for defendant.

MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PHILIP PRATT, District Judge.

This cause of action, arising chiefly under the Dealer's Day in Court Act (DDCA), 15 U.S.C. §§ 1221–1225 is before this Court on defendant Ford Motor Company's Motion for Summary Judgment dismissing plaintiff Sink Ford, Inc.'s three count complaint. Plaintiff seeks recovery under the DDCA, Count I, under the Michigan Consumer Protection Act, Count II, and under Michigan's common-law of misrepresentation, Count III. Both Counts II and III are before the Court only because of pendent jurisdiction. For the reasons detailed below, defendant's motion for summary judgment is granted as follows: Count I is dismissed with prejudice and the pendent state law claims in Counts II and III are dismissed without prejudice.

## I. FACTS

There is no genuine issue as to the material facts on which defendant's motion for summary judgment is based. George Sink,[1] President of Sink Ford, Inc., was not a neophyte to the general business world, or automobile retailing specifically, when he, in partnership with his son, Jonathan, became a Ford Dealer in May of 1976.

After service with the Air Force, and a year's study in accounting and business administration at Southland College of Commerce, George Sink worked as credit manager for one firm, an independent distributor of appliances, and in the credit and accounts receivable department of another firm.

In 1955, Mr. Sink worked in both sales and the office for a LaPorte, Indiana auto dealer, subsequently co-managed a Studebaker dealership for one year, and worked in both sales and sale management for Delberg Olds & Cadillac in Niles, Michigan. In 1969 George Sink in 50% partnership with another formed Sink Motors, Inc., a Datsun dealership which he was managing at the time he was approached by Joseph Pichler, a Market Representative Manager with defendant Ford Motor Company. Sink had developed the Datsun dealership into a somewhat profitable concern, but a falling out with his partner, Goldy, who had provided half of the capital (but none of the management expertise) coupled with Sink's own prediction that import sales would be in decline due to price increases, left Sink an eager prospect to take over the Ford dealership in Berrien Springs.

George Sink was first contacted in the fall of 1975 concerning the availability of Lew Evan's Ford by Mr. Pichler, whose primary job was the recruitment of individuals with both automotive experience and adequate financial resources to buy in and operate a dealership for Ford. The particular dealership that Pichler offered Sink had been in decline as had the previous dealership on that site. Pichler assured Sink that the failures were due to bad management, not any inherent problems with the location. During the discussions, Sink stressed his concern that cars be available so he could sell them—citing non-availability as one of the factors that limited the growth of his Datsun dealership. Pichler promised Sink that Ford could deliver all the cars that Sink Motors could sell.

Defendant Ford, through Pichler, prepared and gave George Sink Dealership Investment Requirement and Profit and Sales Forecast forms in March, 1976.[2] These set forth financial and sales details relating to past sales experience of the dealership rela-

---

1. George Sink was originally named individually as both a plaintiff in Count I, and a defendant to Ford's counterclaim. Subsequently the parties have stipulated to George Sink's dismissal with prejudice from both capacities. Plaintiff Sink Ford, Inc. remains liable to Ford Motor Company on a counterclaim in the amount of $29,959.18 for monies owing on certain vehicles, per the parties' stipulation. Because this Opinion and Order dismisses all other claims in the lawsuit, entry of final judgment is appropriate.

2. Mr. Sink had previously been provided with a Sales and Profit Forecast dated October of 1975 which Mr. Pichler had prepared before even approaching Mr. Sink. The accuracy of the October 1975 forecast has not been challenged.

tive to comparable dealerships in that region as well as the expected potential for future sales. The figures covered sales of both new and used cars, as well as the volume of the parts and service departments. In setting forth the forecast for parts and service, Pichler misadded some figures, so that the amount of $117,747 was added in twice erroneously, placing the total expected selling gross for parts and service at $336,420 rather than $218,673. To the extent that this was crucial to other calculations, those amounts were also incorrect.

In addition, this figure was based on defendant's estimate that there were 2,300 Ford "Units in Operation," that were potential parts and service customers, including all Fords up to eight years of age. Subsequently, and unrelated to Sink's becoming a dealer, defendant, at the national level, changed the definition of "Units in Operation" to cover only those cars six years old or less. This change interacted with the erroneous addition to reduce greatly plaintiff's profit potential, although plaintiff focuses on Pichler's miscalculation.

Defendant's miscalculation, though apparent on the face of the document, was not discovered by either George Sink, his son, or anyone at Ford Motor Company until October of 1978, when because of the dealer's poor performance, Sink was called in for a profit and sales conference, given revised forecast figures and suggestions to improve operations, and requested to invest more capital.

Notwithstanding the patent errors in defendant's forecast, Sink entered into a dealership contract around June of 1976, having invested some $85,000 garnered from the sale of his Datsun Dealership (including good will) and $25,000 from his son Jonathan who was made Vice President of the renamed corporation; Sink Ford, Inc. Sink also secured inventory financing (known as the "floor plan") from Inter-City Bank after he had been refused such financing by Ford Motor Credit Corporation.[3] At the time of entering into the dealership contract, Sink signed a form that indicated he did not rely on Ford's forecasts but his own independent assessment and judgment (G. Sink Deposition Ex. 13), and executed another form to the effect that he realized an additional input of capital could be required to bring his investment up to some $120,000. (G. Sink Deposition Ex. 18).

Sink commenced operation of the dealership near the close-out of the model year which severely limited the availability of inventory from the factory. The assets of Lew Evan's Ford, which plaintiff had purchased included eight models whose relative undesirability was evidenced by the fact that the units remained unsold. Throughout Sink Ford, Inc.'s history, the dealership was plagued with inventory problems stemming from undercapitalization in that as new stock arrived which may have enhanced plaintiff's inventory mix, it had to be refused because the inventory financing was all allocated to previously delivered, less desirable models which weren't moving, as well as a poor mix of merchandise delivered by Ford,[4] and alleged delay by defendant in reimbursing Sink Ford, Inc. for service performed under warranty.

---

3. In preparing his proposal for inventory financing by FMCC, George Sink explicitly relied on the earlier October 1975 forecast, not the erroneous figures of March 1976.

4. Sink maintains that his dealership never received some cars that it ordered, while Ford delivered unordered cars and trucks with combinations of options which rendered them unsaleable, thus leaving Sink with inadequate inventory financing when ordered and desirable vehicles were ultimately shipped. Ford denies shipping cars which weren't ordered, and offers a counter explanation that the orders were filled later than the month when ordered—or that items were shipped pursuant to a policy of shipping vehicles in bulk when dealers had not "specked out" enough vehicles to fill their monthly delivery quota. Nevertheless the matter is irrelevant and does not preclude summary judgment because, as a matter of law, even if Ford Motor had misallocated automobiles, that in itself is not a violation of DDCA. See *Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 445 (9th Cir. 1979).

The financing problem was compounded by the disarray of plaintiff's books and records, due in part to his accountant's illness, and the substitute's inability to organize the office. Throughout George Sink's deposition it is clear that part of plaintiff's problems were due to poor recordkeeping and Sink's inability to control the operations because basic figures were not available. The lack of documentation was noted as one area which needed correction in the October 1978 Profit and Sales Conference, and has also rendered documenting plaintiff's charges of unordered shipments more difficult.

The management problems proved insurmountable, the demands for additional investment unmeetable and ultimately, in October 1978, even before the Profit and Sales Conference, George Sink sought to resign the dealership and simply sell used cars and service. His resignation was not accepted by Ford until August 24, 1979, although the shipment of new cars had stopped earlier because the bank had cut off Sink Ford's credit.

## II. COUNT I—THE DEALER'S DAY IN COURT ACT

In order to avoid summary judgment on defendant's motion plaintiff has sought to raise genuine issues of material fact concerning the intentions of Ford in miscalculating the October 1975 forecast, the representation of Pichler concerning the availability of cars, misallocation of automobiles shipped for sale, delay in reimbursing for warranty service, Ford's refusal to accept Sink's resignation, and Ford's initial approval of the dealership at the outset, in light of defendant's awareness of Sink's undercapitalization.

In evaluating defendant Ford Motor Company's prayer for summary judgment under the Dealer's Day in Court Act, the Court must determine whether any of defendant's alleged acts of conduct are those the DDCA is intended to redress. Construing the evidence in plaintiff's favor and allowing all favorable inferences as the Court is required to do in reviewing defend-

ant's motion for summary judgment, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), the Court finds that plaintiff has alleged the following wrongful conduct on the part of Ford Motor Company.

1. Misrepresentation by inaccurate adding of figures on the Profit and Sales Forecast.

2. Failure to provide cars as ordered by Sink Ford, Inc.

3. Delivery of cars that plaintiff did not order.

4. Enticing George Sink into a dealership though defendant knew or should have known that Sink lacked adequate capital.

5. Requesting investment of additional capital beyond the investor's means.

6. Slow performance on parts repurchase and warranty obligations.

7. Refusal to accept George Sink's resignation so that he could mitigate expenses.

Whether defendant's actions rise to the level of wrongful conduct—that which lacks good faith—must be measured against the special, relatively narrow, definition of good faith under Section 1 of the Dealer's Day in Court Act:

(e) The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e).

Thus the Court must determine whether any of defendant's actions were "coercive" or "intimidating"; absent a showing of such conduct, plaintiff has failed to state a claim under the DDCA. *See Overseas Motors, Inc. v. Import Motors, Ltd., Inc.,* 519 F.2d 119, 125 (6th Cir.) *cert. denied* 423 U.S.

987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975). Mere arbitrariness or bad faith is not enough, *id.;* plaintiff must prove " 'a wrongful demand which will result in sanctions if not complied with' ", *Fray Chevrolet Sales, Inc. v. General Motors Corporation,* 536 F.2d 683, 685 (6th Cir. 1976) quoting *Ship & Shore Motors, Inc. v. British Leyland Motors, Inc.,* 74–1 CCH Trade Cases, ¶ 75,102 (D.N.J.1974). As will be detailed below the Court cannot discern anything in defendant's actions which constitutes a "wrongful demand," though certainly greater cooperation might have enabled plaintiff to succeed.

### 1. *Misrepresentation by inaccurate calculations.*

■ The miscalculation of the Profit and Sales Forecast was obvious on the face of the document, and as readily discernible by plaintiff's officers as it was by defendant's personnel. Furthermore, the record does not support any reasonable reliance by George Sink on the erroneous March 1976 figures. George Sink's unsuccessful application to Ford Motor Credit Corporation for inventory financing relied not on the inaccurate March 1976 forecast, but on the earlier figures of the October 1975 forecast. Subsequently, when George Sink executed the dealership agreement with the March 1976 forecast before him, he affirmatively disavowed any reliance on those figures by signing a prospective dealer application on March 18, 1976 which so stated. (G. Sink's Deposition Ex. 13). Finally, any reliance on Ford's erroneous figures would have been unreasonable in light of Mr. Sink's past business education and experience.

■ Furthermore, as defendant notes, any inference of wrongful demand arising from defendant's miscalculation of the sales potential and the related capital investment requirement was negated by plaintiff's voluntary investment of working capital in excess of $85,000. This sum exceeds the amount of capital required according to either the erroneous calculations of March 1976: $72,373 or the lower corrected figure of $64,213.[5] (Defendant's Reply Brief, p. 6).

### 2. *Failure to deliver ordered vehicles;*

### 3. *Delivery of unordered vehicles.*

These two claims lend themselves to a joint discussion. In the context of the DDCA neither forcing the dealer to buy undesirable large cars in order to get desirable small ones, while refusing to accept the return of unsold large models, *Bob Maxfield, Inc. v. American Motors Co.,* 637 F.2d 1033 (5th Cir.), *cert. denied* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981); nor "excessive shipments of undesirable colors and models," *Southern Rambler Sales, Inc. v. American Motors Co.,* 375 F.2d 932, 935 (5th Cir.), *cert. denied* 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967) have been held to constitute violations of the Act.

■ Plaintiff's complaint of defendant's failure to fill customer orders, and receipt of unsaleable vehicles, e.g., six-cylinder, four-speed pick-ups with sliding rear windows and stereo radios (G. Sink's Deposition Transcript II at 73–75) were no doubt well founded, and defendant's performance probably contributed to plaintiff's financial problems. Nevertheless, the conduct is not a violation of the Act. There is no "statutory right or formula for allocation or delivery of certain cars." *Southern Rambler, supra* at 935. This is not a case where plaintiff was required to accept delivery of one slow mover to obtain a more saleable model, a practice held to be coercive and thus violative of the DDCA in *American Motors Sales Corporation v. Semke,* 384 F.2d 192 (10th Cir. 1967). Although it ap-

---

5. The fact that the miscalculation occurred prior to the franchise formation does not of itself, preclude the application of the DDCA. Defendant reads *Lewis v. Chrysler Motors Corp.,* 456 F.2d 605 (8th Cir. 1972) for more than it is worth. In reversing the District Court's dismissal on the pleadings, the Eighth Circuit merely remanded the matter to determine whether a dealer-manufacturer relationship existed at the time of the alleged bad faith conduct by defendant. In some circumstances, the DDCA protects negotiations. *See Colonial Ford, Inc. v. Ford Motor Co.,* 592 F.2d 1126, 1128 (10th Cir.) *cert. denied* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979).

pears that in some instances delivery on plaintiff's orders was delayed so that by the time vehicles arrived they no longer met plaintiff's needs, this conduct was not coupled with coercion, and therefore does not state a claim under the Act. *See Cecil Corley Motor Co., Inc. v. General Motors Corp.,* 380 F.Supp. 819, 835–41 (M.D.Tenn. 1974).

#### 4. *Enticement of George Sink into dealership, though capitalization was inadequate.*

██ By this rather novel theory, plaintiff urges that defendant Ford Motor Company should have protected Mr. Sink from his own stupidity. Even if Mr. Pichler's calculations (disregarding the erroneous addition in the March 1976 forecast, discussed *supra*) did amount to a "tailoring" of the initial requirements to conform to Sink's assets, this does not amount to coercive conduct. The purpose of the DDCA is generally to protect dealers from wrongful termination, not wrongful commencement. *See Overseas Motors, Inc. supra,* 519 F.2d 119.

#### 5. *Request for additional capital.*

█ George Sink executed a Net Working Capital Agreement with Ford Motor Company on May 26, 1976 in which he acknowledged that $107,160 was the Minimum Net Working Capital required, and that that figure could be raised or lowered if either company guides or conditions changed. A subsequent request by an automobile manufacturer for extra capitalization, as agreed, does not constitute either wrongful conduct or coercion. *Augusta Rambler Sales, Inc. v. American Motors Sales Corp.,* 213 F.Supp. 889, 892, 894 (N.D. Ga.1963).

#### 6. *Slow performance of warranty obligations.*

█ Although slow performance of warranty obligations, and, in the same vein, parts repurchase agreements no doubt contributed to plaintiff's cash flow problems, neither of these actions state claims under the DDCA. *Bob Maxfield, Inc. v. American Motors Co., supra,* 637 F.2d at 1039 (unkept promise to take back parts overstock does not state claim); *Cecil Corley Motor Co., supra,* 380 F.Supp. at 847–48.

#### 7. *Refusal to accept George Sink's resignation.*

█ While it is true that a bad faith refusal to approve the transfer of a dealership may violate the DDCA, *see Fray Chevrolet Sales, Inc. v. General Motors Corp.,* 536 F.2d 683, 684–85 (6th Cir. 1976), there is no element of coercion underlying defendant's delay in accepting Sink's resignation. Even though in the interim Sink remained obligated for basic expenses with no hope of reviving the dealership, because he had lost all inventory financing, an essential element of coercion in refusal to transfer claims—a willing qualified buyer—is missing. *See Francis Chevrolet v. General Motors Corp.,* 602 F.2d 227, 229 (8th Cir. 1979).

In sum, none of defendant's actions taken individually, or together as a single course of conduct rise to the level of coercion or intimidation necessary to state a claim under the DDCA. Because of the narrow definition given to "good faith" under the Act, determination of its absence does not necessarily raise a question for the trier of fact. On the facts before the Court, dismissal of Count I on defendant's Motion for Summary Judgment is appropriate.

An alternate ground for dismissal of Count I is that plaintiff's suit was not timely filed. Section 3 of the DDCA provides a three-year statute of limitations from the time the cause of action accrued. Both parties agree for the purposes of the statute of limitations argument that the wrong consists of the erroneous calculations in the Dealership Sales and Profit Forecast and Investment Requirement Forms of March 1976. The parties dispute, however, when the cause of action accrued. Defendant urges that plaintiff's claim accrued when the erroneous forecasts were made in March of 1976, and are thus time-barred because plaintiff did not file suit until January 2, 1980. Plaintiff urges the Court to

adopt the accrual rule from antitrust law which states that no cause of action accrues until "the consequences in terms of ascertainable or probable damages" are certain, *Colonial Ford, Inc. v. Ford Motor Co.,* 577 F.2d 106, 112 (10th Cir. 1978), *on reh'g.* 592 F.2d 1126 (10th Cir.) *cert.* denied 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979), and hold that the cause of action did not accrue until discovery of Ford's error in October, 1978.

The Court declines to follow the reasoning of *Colonial Ford* because in this case the misrepresentation was obvious on its face. "The general rule is that a limitation period begins to run when the claimant discovers, or in the exercise of due diligence, should have discovered the acts constituting the alleged fraud." *Campbell v. Upjohn Co.,* 498 F.Supp. 722, 726 (W.D.Mich.1980), *aff'd* 676 F.2d 1122 (6th Cir. 1982).

■ In light of George Sink's business and accounting training, and his job experience in both office work and management in various auto dealerships, it is not unreasonable to expect plaintiff, in the exercise of due diligence, to have discovered defendant's error. Here, there was neither fraud, nor active concealment by defendant. This Court finds that the cause of action accrued prior to January 2, 1977 and therefore plaintiff's cause of action under the DDCA is barred by the three year statute of limitations. For both of the reasons given above, defendant's Motion for Summary Judgment as to Count I is granted.

■ Defendant also seeks summary judgment on Counts II and III, plaintiff's claims under the Michigan Consumer Protective Act, M.C.L.A. § 445.901 *et seq.,* and Michigan's common law of misrepresentation, respectively. The only jurisdictional basis for either of these claims is pendent jurisdiction because they arise from a common nucleus of operative facts. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). After considering the factors of judicial economy, convenience and fairness to the litigants, because the federal claim has been dismissed prior to trial, this Court declines to exercise its discretionary power to resolve matters which are wholly questions of state law. *United Mine Workers v. Gibbs, supra* at 726, 86 S.Ct. at 1139. Furthermore fairness dictates that the dismissal of plaintiff's state law claims, as yet unheard must be without prejudice. *Martin v. T.V. Tempo, Inc.,* 628 F.2d 887, 890 (5th Cir. 1980).

Therefore, defendant's Motion for Summary Judgment is granted, dismissing Count I under the Dealer's Day in Court Act with prejudice and plaintiff's state law claims in Counts II and III without prejudice.

IT IS SO ORDERED.