**Matt M. KOTULA, d/b/a Albany Motor Sales, Appellant,**

v.

**FORD MOTOR COMPANY, a Delaware Corporation, Appellee.**
**No. 17684.**

United States Court of Appeals
Eighth Circuit.

Nov. 19, 1964.

Wayne G. Popham, of Erickson, Popham, Haik & Schnobrich, Minneapolis, Minn., made argument and filed brief for appellant; Robert A. Minish, Minneapolis, Minn., of the same firm was with Wayne G. Popham on the brief.

Richard J. Leonard, of Doherty, Rumble & Butler, St. Paul, Minn., made argument and filed brief for appellee; and Wright Tisdale and J. Michael Guenther, Dearborn, Mich., of the Ford Motor Co., Dearborn, Mich., were with Richard J. Leonard, on the brief.

Before MATTHES, BLACKMUN and RIDGE, Circuit Judges.

MATTHES, Circuit Judge.

Matt M. Kotula d/b/a Albany Motor Sales, instituted this action against Ford Motor Company, under 15 U.S.C.A. §§ 1221–1225, known as the Automobile Dealers' Franchise Act, and sometimes as Automobile Dealers' Day in Court Act, seeking damages for claimed wrongful termination of his franchise agreement with defendant Ford Motor Company. Plaintiff obtained a favorable jury verdict, but the Court entered an order granting defendant's motion for judgment under Rule 50(b) Fed.R.Civ.P., and granting defendant's alternative motion for new trial under Rule 50(c) (1), Fed. R.Civ.P.[1] From the judgment entered thereon, plaintiff has appealed. His basic contention is that the evidence supports the "finding that the defendant committed acts of coercion and intimidation".

We shall refer to the parties as they were designated in the trial court, except at times defendant will be referred to as Ford.

In brief, plaintiff predicated his cause of action on the theory that defendant failed to act in "good faith" in terminat-

ing and cancelling the franchise, and that such termination resulted from coercive conduct on the part of representatives of defendant. The evidence relied upon to establish coercion and intimidation will be detailed during the course of the opinion. The defense was that the termination did not result from failure to act in good faith. The trial court, Judge Nordbye, so found in granting judgment n. o. v. and concluded "[that] as a matter of law * * * the termination proceedings were in no way connected with any alleged coercive tactics on the part of defendant, and were in no way tinged with any elements of coercion, duress or intimidation".

Before proceeding to a review of the pertinent facts it is desirable to direct attention to the provisions of the Act and to the interpretation thereof by the Courts.

■ The Act, adopted in 1956, was designed to supplement the anti-trust laws of the United States "in order to balance the power now heavily weighted in favor of automobile manufacturers". See preamble to House Report 2850, U.S. Code Cong. and Adm.News, 84th Congress, Vol. 3, p. 4596. Under 15 U.S.C.A. § 1222, an automobile dealer may bring suit in the appropriate district court of the United States without respect to the amount in controversy for the purpose of recovering damages "by reason of the failure of * * * [the] automobile manufacturer * * * to act in *good faith* in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise with said dealer: * * *." (Emphasis supplied.)

The term "good faith" shall mean the duty of each party to any franchise, their officers, employees, or agents, "to act in

1. In sustaining defendant's motion for new trial, the Court stated: "It follows * * * that if the Court's order granting defendant judgment notwithstanding the verdict is reversed or vacated, then defendant's alternative motion for new trial is granted". This order was premised on lack of the evidence to estab-

lish that termination of the franchise agreement resulted from coercion or intimidation and because "plaintiff has failed to establish by the greater weight of the evidence that defendant was not authorized to terminate the contract under Paragraph 17(a) (1) thereof".

a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith", 15 U.S.C.A. § 1221. In Milos v. Ford Motor Company, 317 F.2d 712, 715 (3 Cir. 1963) and in Globe Motors, Inc. v. Studebaker-Packard Corporation, 328 F.2d 645, 646 (3 Cir. 1964) this pronouncement appears: "The critical term is 'good faith' which is defined as 'the duty of each party * * * to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation'". In the Globe Motors case, the Court further stated at page 646, "The statute did not provide a new remedy for breach of contract but created a new cause of action. An indispensable element of the statutory cause of action is not the lack of good faith in the ordinary sense but a lack of good faith in which 'coercion, intimidation or threats' thereof are at least implicit." The legislative history and other cases use slightly different language, but with the same meaning, stating that "good faith" must be determined in the "context" of coercion or intimidation or threats thereof. See House Report 2850, U.S.Code Cong. & Adm.News, Vol. 3, page 4603; Staten Island Motors, Inc. v. American Motors Sales Corp., 169 F.Supp. 378 (D.N.J. 1959); Woodard v. General Motors Corp., 298 F.2d 121, 127, 128 (5 Cir. 1962), cert. denied, 369 U.S. 887, 82 S. Ct. 1161, 8 L.Ed.2d 288 (1962), reh. denied, 370 U.S. 965, 82 S.Ct. 1584, 8 L.Ed. 834 (1962); Garvin v. American Motors Sales Corp., 318 F.2d 518, 519 (3 Cir. 1963); Pierce Ford Sales, Inc. v. Ford Motor Company, 299 F.2d 425, 430 (2 Cir. 1962), cert. denied, 371 U.S. 829, 83 S.Ct. 24, 9 L.Ed.2d 66 (1962); Augusta Rambler Sales, Inc. v. American Motors Sales Corp., 213 F.Supp. 889, 893, 894 (N.D.Ga.1963); Blenke Brothers Co. v. Ford Motor Company, 203 F. Supp. 670, 671 (N.D.Ind.1962); Leach v. Ford Motor Company, 189 F.Supp. 349, 351 (N.D.Cal.1960); see also Kessler, Automobile Dealer Franchises: Vertical Integration by Contract, 66 Yale L.J. 1135, 1177–1180 (1957); Kessler and Stern, Competition, Contract and Vertical Integration, 69 Yale L.J. 1, 104–107 (1959); Freed, A Study of Dealers' Suits Under the Automobile Dealers' Franchise Act, Univ. of Detroit L.J., Vol. 41, 245; Note, 70 Harv.L.R. 1239, 1246–50 (1959).

We now attend to the facts. The Midwest Region of Ford is headquartered at Chicago, Illinois, and includes the Twin City District. This District with headquarters in Minneapolis, Minnesota, includes the State of Minnesota, and is subdivided into 18 Zones and approximately 325 dealers operate therein. The franchise under consideration is located in Zone "J".

Plaintiff became a Ford dealer in 1947 in an area which is made up of the Towns of Albany and Avon, Minnesota, and surrounding territory, having a population of approximately 4000 persons. Plaintiff's place of business was located in Albany where there were also Chevrolet and Plymouth dealers. The last franchise agreement between plaintiff and defendant being the one pertinent to this action was executed April 1, 1957, and was to continue in force and effect until terminated by either party under the provisions of Paragraph 17. Paragraph 17(a) (1) of the agreement, applicable here, authorized defendant to terminate the agreement for certain causes on notice to plaintiff not less than 90 days prior to effective date of notice; Paragraph 17(a) (6) provided that because the agreement was for an indefinite term it could be terminated by defendant at will at any time on notice to plaintiff not less than 120 days prior to effective date of notice. Under the agreement, plaintiff assumed and agreed to carry out and perform the duties, obligations and responsibilities which were defined in numerous para-

graphs including 2(a) relating to sales and providing in pertinent part:

"The Dealer shall promote vigorously and aggressively the sales of VEHICLES at retail, * * * in the DEALER'S LOCALITY, making use to the greatest reasonable extent of the Company's advertising and sales promotions and merchandising material * * *. Whether or not the Dealer shall have vigorously and aggressively promoted such sales in the DEALER'S LOCALITY and shall have energetically and satisfactorily developed the potentiality for such sales and obtained a reasonable share thereof, shall be determined by reference to such reasonable criteria as the Company may develop from time to time including, without limitation, in the case of VEHICLES (1) the relationship of the Dealer's retail sales of VEHICLES to users located in the DEALER'S LOCALITY to (a) the total registrations of VEHICLES in such locality, (b) the fair and reasonable retail sales objectives of VEHICLES established for the Dealer for such locality, and (c) the registrations of automobiles (or trucks) of other manufacturers selected by the Company and generally competitive with VEHICLES in price and product characteristics * * * and (2) comparison of each of the relationships referred to in the foregoing clause (1) with (a) similar relationships with respect to each of not less than three (3) other authorized Ford dealers of reasonably comparable size and located in the nearest areas of sales and service responsibility reasonably comparable to the DEALER'S LOCALITY, and (b) similar relationships with respect to the average of all authorized Ford dealers as a group in one or more of the following areas: The Company's zone sales area in which the Dealer is located; the Company's district sales area in which the Dealer is located; the Company's regional sales area in which the Dealer is located; and the national sales area. * * * "

On or about May 26, 1961, the District Sales Manager informed plaintiff that he was sending plaintiff's file to the Regional Office with the recommendation that his franchise be terminated. The District Office compiled a file which purported to reflect meetings between plaintiff and Ford representatives and the efforts of the representatives to improve plaintiff's performance as a dealer, the negative results obtained, and the reasons for recommending termination. The file was submitted to the designated Ford officials in Chicago and in Detroit, as required by the agreement, and was reviewed by these officials who approved the recommended termination.

By notice dated November 10, 1961, and pursuant to sub-Paragraph 17(a) (1), plaintiff was notified that the agreement was being terminated "because of your failure to perform your duties, obligations and responsibilities thereunder". Thereafter upon request by plaintiff, defendant's Dealer Policy Board afforded plaintiff a hearing, conducted an exhaustive independent investigation and, after being fully apprised of plaintiff's performance under the agreement confirmed the recommendation for termination. The termination became effective May 28, 1962. The complaint in this case was filed May 4, 1963.

█ The foregoing facts, in large measure, stand undisputed. We now give consideration to the evidence upon which plaintiff must and does rely as affording proof that defendant failed to act in "good faith" in terminating his franchise. Although this evidence was contradicted, we are required because of the present posture of the case to view the evidence in the light most favorable to plaintiff and we must give to plaintiff the benefit of all inferences which may reasonably be drawn from the evidence.

The trouble began in early May, 1959, when the General Field Manager of Ford

notified plaintiff that he had to "take" a two-ton, F–600 truck. Plaintiff remonstrated because of lack of a market for such a truck. The representative persisted in his demand, stating: "you either take that truck or you're not going to be a Ford dealer. If you don't want that truck, you don't want to be a Ford dealer." The upshot of this controversy, according to plaintiff, was his inability to procure delivery of two automobiles which were then on order; that in an effort to obtain the automobiles plaintiff made a telephone call to the Ford District Office and finally on May 18, 1959, called Ford's general office in Detroit. Two days after the latter call, the District Manager and the General Field Manager called on plaintiff at his place of business. They "appeared to be angry because plaintiff called Detroit". They asked plaintiff to resign and "threatened him with termination if he did not resign". Sometime later, at the insistence of another Ford representative, plaintiff purchased the truck and thereafter received delivery of the two automobiles. Eventually plaintiff sold the truck at a loss of $125.00.

Plaintiff's position is that the foregoing truck incident was permeated with coercion and intimidation and threats thereof; that there emanated from this event a plan and scheme whereby baseless, inadequate and insufficient grounds of inefficiency were compiled against plaintiff; and that such plan was designed to and did in fact cause officials of Ford to act upon the baseless and insufficient charges which were submitted in support of the recommended termination. Plaintiff further argues that the evidence shows other events occurred which established a pattern of conduct consistent with the supposed scheme to wrongfully terminate his franchise agreement. Thus, we are reminded that in February, 1960, when plaintiff again demurred to a request that he purchase another F–600 truck, the same General Field Representative made this statement to him: "Look, Kotula, if its the last thing I ever do, it will be to make you wish you were never a Ford dealer in your life. * * * Don't ever forget it, Mr. Kotula, that I will get you yet."

The difficulty with plaintiff's premised theory is that the favorable evidence, when judged by the controlling legal principles, wholly fails to establish any causal connection between the coercive conduct relied upon, and the termination of the agreement. Whether plaintiff had a cause of action under the Act for damages, if any, he sustained from the pressure that was exerted in connection with the 1959 truck incident, need not be decided. The fact is plaintiff did not include as an element of his claimed damages any loss resulting from the purchase of the truck.

Moreover, the facts are that from and including the year 1957, plaintiff failed to fulfill his contractual obligations under Paragraph 2(a), quoted in part, supra. Here, it should be noted that no claim has ever been made by plaintiff that the criteria established therein were unreasonable, unfair, oppressive or arbitrary. Appellant admitted that the sales objectives established under the agreement were not met, and indeed the documentary evidence shows that plaintiff failed to compete satisfactorily in his territory for Ford sales, and failed to provide satisfactory competition against Chevrolet. The following demonstrates one facet of plaintiff's submarginal performance:

|  | 1957 | 1958 | 1959 | 1960 | 1961 |
|---|---|---|---|---|---|
| Sales made by plaintiff within franchise area .. | 13 | 10 | 22 | 13 | 11 |
| Total sales of plaintiff .. | 18 | 15 | 23 | 13 | 15 |
| Fords registered in Albany trade area ....... | 33 | 22 | 37 | 17 | 22 |

From these figures, the following percentages are obtained:

|  | 1957 | 1958 | 1959 | 1960 | 1961 | Aver. |
|---|---|---|---|---|---|---|
| Total sales of plaintiff (including sales to nonresidents) as a percent of Fords registered in the area ... | 55% | 68% | 62% | 76% | 68% | 65.9% |
| Percent of Fords registered in the Albany area which were sold by plaintiff ........ | 39% | 45% | 59% | 76% | 50% | 54.8%[2] |

Plaintiff's undisputed net earnings, including about $1000.00 per year from his bus operations and his salary of $15.00 a month as Mayor, are further evidence that he was a submarginal dealer. In 1959 his net was $5,637.32; in 1960, $3,434.70; in 1961, $4,715.83 and 1962, $3,100.45.

Plaintiff's sales performance did not meet the approval of Ford. Its representatives endeavored on periodical contacts with plaintiff to assist him in his operations and to persuade him to change his business methods so that his sales record would improve. Admittedly, plaintiff had operated a school bus continuously since 1957, requiring his absence from his business for a period each morning and afternoon. Repeated efforts were made to convince plaintiff of the necessity of devoting all of his time to the operation of his business, but plaintiff refused to discontinue the side activity. He refused to employ a salesman or additional mechanics; he ignored repeated requests to establish a new sales program, in fact this record demonstrates that plaintiff not only did not welcome or countenance any interference by Ford's representatives, but that he conducted the business in accordance with his own judgment. His testimony under cross-examination attests to his attitude:

"Q. I am referring specifically to the over-all contractual obligations, Mr. Kotula, if you didn't agree with the suggestion or recommendation of the Ford representatives, you didn't do it, isn't that right, sir?

"A. You would be right in saying that, yes.

\* \* \* \* \* \*

"Q. You never did do anything you couldn't see your way clear on, isn't that right?

"A. That I never did anything I couldn't see my way clear?

"Q. Yes, sir.

"A. Well, that's right."

The termination file upon which the Ford officials acted is made up of statistics, including "Dealer Contact" reports, revealing every phase of plaintiff's op-

2. The documentary evidence also establishes that plaintiff failed to fulfill his sales objectives as required by defendant in accordance with the franchise agreement. Thus in 1957, plaintiff accomplished 38.3% of his sales objective, whereas the sales of all the dealers in his zone were 99.4% of their total objectives and in the District 100.9%. In 1958, he fulfilled 30.6% of his sales objective compared to the Zone total of 81.6% and the District total of 91.7%. In 1959 he fulfilled 43.4% of his objective compared to a Zone total of 136.2%, and District total of 111.9%. In 1960, he fulfilled 37.1% of his sales objective compared to a Zone total of 128.5%, and District total of 80.8%. In 1961, he fulfilled 41.7% of his sales objective compared to a Zone total of 99.5% and a District total of 90%.

eration. It would unduly burden and lengthen this opinion to enumerate all of the contents of this file. It has been carefully examined and among other matters discloses that between May 14, 1959, and July 6, 1961, both inclusive, plaintiff was contacted by Ford's representatives approximately 25 times. Reports of these contacts show a pattern of suggestions and advice designed to enable plaintiff to improve his performance.

We are mindful of the evidence plaintiff offered tending to establish that "false" registrations of new automobiles, were reported by the competing Chevrolet dealer. It appears that this dealer sold vehicles to persons living outside his franchise territory but in reporting the sales to the State of Minnesota, showed that such outside purchasers were residents of the Albany territory. Apparently this procedure improved the Chevrolet dealer's sales performance in the eyes of General Motors Corporation, and brought about an increase in his quota for new automobiles. The R. L. Polk Company, recognized in the industry as the most reliable source of new car registrations, assembles information from the State records and furnishes it to automobile manufacturers who rely thereon in preparing sales quotas for their dealers. Plaintiff endeavored to establish that Ford's comparative measurements, that is, its planning or market potential and its program and leadership objectives as applied to him, were knowingly based upon such invalid or false registrations.

From these circumstances, plaintiff argues that, "While the Twin City District had nothing to do with falsifying the figures, they did use these figures as a convenient basis for terminating the plaintiff's franchise. * * * The jury could well find that if the defendant was acting in good faith it would not have insisted on using these baseless sales measurements but, when called to their attention, they would have promptly defended their dealer and have straightened out his sales comparisons in order

to compensate for this improper registration situation."

For compelling reasons we are not persuaded by appellant's argument. As Judge Nordbye expressed it in his memorandum opinion granting judgment n. o. v.:

"But eliminating sales made by the competing dealers to residents outside the Albany-Avon area who for some reason came into the area to make their car purchases, plaintiff's showing as to sales falls substantially below that of his competitors."

Furthermore, plaintiff's alleged failure to meet competition is only one of numerous other reasons assigned by Ford as the bases for termination of the agreement.

■■ The termination file and other evidence establishes that from time to time Ford's representatives did offer recommendations; they did make suggestions; they did urge plaintiff to adopt better business practices; they did insist that plaintiff devote his full time to the business and they did request plaintiff to resign or sell his dealership. But what defendant did in this regard was protected activity absent evidence to warrant the inference that this conduct flowed from and was caused by a concocted plan or scheme to "get" plaintiff. As we have seen, the Act itself provides that "recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith", 15 U.S.C.A. § 1221(e). And as pertinently stated by the Fifth Circuit in Woodard v. General Motors Corporation, supra, 298 F.2d at page 128:

"As is said in the House Report, the Act 'does not prohibit the manufacturer from terminating or refusing to renew the franchise of a dealer who is not providing the manufacturer with adequate representation. Nor does the bill curtail the manufacturer's right to cancel or not to renew an inefficient or undesirable dealer's franchise.' H.R.Rep. No.

2850, 84th Cong. 2d Sess. 9. We do not think that the good faith requirement, whether viewed in or outside of the context of coercion, prevents a manufacturer from terminating a contract with a dealer where the dealer has, over a long period of time, violated a valid and material clause of the contract and has failed to comply with the continuing insistence of the manufacturer upon performance. And it is shown, we think, by the quoted portions of the House Report, that there was no legislative intent that the prohibited coercion should include a threat of cancellation if there should be a prolonged failure on the part of the dealer to heed the recommendations or yield to the persuasion of the manufacturer that the dealer make a bona fide effort to comply with its undertakings."

One additional and vital phase of the case requires comment. The termination procedures provide that the notice of termination shall advise the dealer of his right to appeal to the Dealer Policy Board. This requirement was met— the notice informed plaintiff of his right to request a conference with the Dealer Policy Board, which was made up of top level officials of Ford. At plaintiff's request, the Board gave him a hearing, and thereafter considered his complaints and objections, including his insistence that the termination was founded upon baseless and groundless charges. The Board also conducted an extensive and independent investigation which among other things developed the true number of vehicles sold by competing dealers to residents of their franchise territories.

Based upon this investigation the Board ultimately decided that the franchise should be terminated. It communicated its findings to plaintiff, "outlining just where we had come out on our analysis of the registration information he had given us, and concluded that his performance was so unsatisfactory that the Company's notice of termination was proper and should be confirmed".[3]

Thus, even if we assumed, which we do not, that there was sufficient evidence to warrant the finding that the termination file depicted a distorted and groundless record of inefficiency and that the causes alleged were a mere pretext for defendant's arbitrary or capricious action, we would be required to go one step further and hold that the evidence was also adequate to warrant a finding that the Dealer Policy Board was a party to the wrongful scheme, and that it too acted in bad faith in its review, investigation and determination. To so hold would require resort to the rankest kind of speculation and conjecture.

We have reviewed and considered all other events pinpointed by plaintiff and relied upon as constituting further proof that defendant failed to act in good faith from the beginning to the end of the termination procedures. From all of this and for the reasons stated, we are satisfied that the trial court's action in granting judgment for defendant notwithstanding the verdict must be sustained. This makes it unnecessary to consider the propriety of the court's order sustaining defendant's alternative motion for new trial.

Affirmed.

---

3. It appears without dispute that terminations for cause rarely occurred. Ford's retail management specialist testified he had been connected with the Twin City Sales Office since 1954 and that this was the only termination that had been processed. A member of the Marketing Staff, Market Representation Department in the Ford Division stated that:

"We don't like to terminate a dealer. It takes a lot of time. It's not good for us. It hurts us usually in the area and we, of course, would rather not have it happen. We would rather be able to rehabilitate an individual and have them [sic] be successful and have them [sic] make money and have him be outstanding in his own area. There is a lot more satisfaction to be able to bring somebody up and help him and improve than there is to disassociate yourself with him."