**CRIM TRUCK & TRACTOR CO., Travis Crim, and Tim Farley, Petitioners,**

v.

**NAVISTAR INTERNATIONAL TRANSPORTATION CORPORATION, Respondent.**

No. D–0092.

Supreme Court of Texas.

Jan. 22, 1992.

Ron Adkison, J. Mitchell Beard, Henderson, for petitioners.

Stephen F. Fink, Steven W. Sloan, Dallas, for respondent.

## OPINION

CORNYN, Justice.

The Motion for Rehearing is overruled. The original opinion in this case is withdrawn and the following opinion is substituted therefor.

This case presents the question of whether there is evidence of a confidential relationship, giving rise to a fiduciary duty, between the parties to a franchise agreement. Plaintiffs are the franchisee, Crim Truck and Tractor Company, Travis Crim and Tim Farley (the Crims). The defendant is the franchisor, Navistar International Transportation Corporation (Navistar), formerly known as International Harvester Corporation. The trial court rendered judgment for the Crims based on jury findings of breach of contract, breach of fiduciary duty and fraud. The court of appeals found no evidence of a confidential relationship which would give rise to a fiduciary duty. 791 S.W.2d 241, 243. The court of appeals also found no evidence of an actionable misrepresentation, an essential element of the Crims' fraud cause of action. *Id.* at 245. The court of appeals, however, found some evidence that Navistar breached its contract with the Crims, but reversed the trial court's judgment because of insufficient evidence to support the damages awarded by the jury on that theory. *Id.* Consequently, the court remanded the case for a new trial on the contract issues. Because we also find no evidence of a confidential relationship,[1] or

1. The standard of review for "no evidence" points entails two inquiries. The first addresses

of an actionable misrepresentation, we affirm the judgment of the court of appeals.

Crim Truck and Tractor's relationship with Navistar's predecessor, International Harvester, began in 1943. The parties enjoyed a mutually beneficial working relationship for years before reducing their agreement to writing in 1958. The written agreement was amended in 1964 and again in 1979. The 1979 revision of the franchise agreement, at issue here, allows the Crims to terminate the franchise at will. However, Navistar could not unilaterally terminate the franchise unless the Crims breached any of eleven conditions of the contract. The contract, furthermore, grants the Crims a reasonable opportunity to cure any claimed breach.

The sometimes stormy[2] relationship between the parties further deteriorated in September 1983. In 1983 Navistar decided to establish a nationwide dealer communications network to share computerized information between Navistar and all of its dealers. This system was designed to facilitate distribution of supplies among dealers, and the provision of warranty and repair services to customers. Navistar called a meeting of all of its dealers in September 1983 to introduce the dealer communications network system. The Crims declined to send a representative to this meeting.

Thereafter, Navistar asked its dealers to sign and return a sales and service agreement that obligated them to purchase the computer equipment required to implement the dealer communications network system. The Crims elected not to sign the contract. In October 1984, Navistar notified the Crims that it considered participation in the dealer communications network mandatory. Navistar also informed the Crims that it considered them to be in anticipatory breach of the contract, but gave them an opportunity to cure the alleged breach by signing and returning the sales and service agreement by November 26, 1984. The Crims never signed and returned the contract.

Finally, on December 10, 1984, Navistar reiterated its intention to terminate the franchise agreement effective April 1, 1985. Once again the Crims were given an opportunity to sign and return the sales and service agreement before the effective date and avoid termination. Because the Crims did not comply with Navistar's repeated requests, the franchise was terminated April 1, 1985.

Thereafter, the Crims brought this suit seeking damages for breach of contract, breach of fiduciary duty and fraud. The alleged loss of past and future profits, diminution of the value of the business, loss of investment, mental anguish, and exemplary damages. The trial court rendered judgment in favor of the Crims in accordance with the jury's verdict. Navistar appealed.

 Historically, we have recognized that certain relationships give rise to a "fiduciary" duty as a matter of law.[3] *See,*

the quality of the evidence offered, inquiring whether the evidence offered has a tendency to prove the existence of a material fact. *See generally* Powers & Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence" Points of Error,* 69 TEX.L.REV. 515, 521–23 (1991). The second is quantitative and inquires as to whether there is more than a mere scintilla of probative evidence. *Id.* We must first address the quality of the evidence offered before we can reach the question of the quantity of the evidence offered.

2. Although both Travis Crim and Tim Farley testified to a generally cordial relationship between the parties, Travis Crim testified that Navistar's predecessor, International Harvester, had threatened termination of the franchise agreement on at least two prior occasions. The first occasion was in 1962, when Travis Crim's father was still running the dealership. This resulted in an exchange of letters threatening legal action between the parties' attorneys. The last occasion, prior to termination of the franchise agreement, occurred in 1976. At that time, International Harvester decided not to renew the Crims' franchise agreement. The parties continued to do business under the terms of the expired contract. At the urging of an International Harvester manager, the contract at issue was executed three years later.

3. We have recognized the difficulty of formulating a definition of the term "fiduciary" that is comprehensive enough to cover all cases. *Kinzbach Tool Co. v. Corbett–Wallace Corp.,* 138 Tex. 565, 571, 160 S.W.2d 509, 512 (1942). However, we have consistently recognized that a fiduciary duty "contemplates fair dealing and good faith, rather than legal obligation." *Texas Bank &*

e.g., *Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 513 (1942) (principal/agent); *Johnson v. Peckham*, 132 Tex. 148, 120 S.W.2d 786, 787 (1938) (partners). More recently, we have also categorized certain relationships as "special relationships," giving rise to a tort duty of good faith and fair dealing. *See, e.g., Aranda v. Insurance Co. of N. Am.,* 748 S.W.2d 210, 212–13 (Tex.1988); *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987). Although a fiduciary duty encompasses at the very minimum a duty of good faith and fair dealing, the converse is not true. The duty of good faith and fair dealing merely requires the parties to "deal fairly" with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, often attributed to a fiduciary duty.

■■■ We have also recognized that certain informal relationships may give rise to a fiduciary duty. *See, e.g., MacDonald v. Follett,* 142 Tex. 616, 180 S.W.2d 334 (1944). Such informal fiduciary relationships have also been termed "confidential relationships" and may arise "where one person trusts in and relies upon another, whether the relation is a moral, social, domestic or merely personal one". *Fitz–Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 261 (1951). Because not every relationship involving a high degree of trust and confi-

dence rises to the stature of a formal fiduciary relationship, the law recognizes the existence of confidential relationships in those cases "in which influence has been acquired and abused, in which confidence has been reposed and betrayed". *Texas Bank & Trust Co. v. Moore,* 595 S.W.2d 502, 507 (Tex.1980). The existence of a confidential relationship is usually a question of fact. *See MacDonald,* 142 Tex. at 623, 180 S.W.2d at 339; *Schiller v. Elick,* 150 Tex. 363, 240 S.W.2d 997, 1000 (1951). Although we recognize that the existence of a confidential relationship is ordinarily a question of fact, when the issue is one of no evidence, it becomes a question of law. *See Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962).

The Crims concede that *not every* franchise agreement creates a fiduciary relationship. But, they argue that the facts here prove a confidential relationship giving rise to an informal fiduciary relationship, imposing the duty on Navistar, not just to seek its own economic interests, but to put the Crims' interests before its own.[4]

■■■ But, this argument clashes with the rule that a party to a contract is free to pursue its own interests, even if it results in a breach of that contract, without incurring tort liability. *See Amoco Production Co. v. Alexander,* 622 S.W.2d 563, 571 (Tex.1981). The fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship. *Consolidated*

---

*Trust Co. v. Moore,* 595 S.W.2d 502, 507 (Tex. 1980); *Kinzbach,* 138 Tex. at 571, 160 S.W.2d at 512.

4. The trial court submitted the question of the existence of a confidential relationship in terms of a fiduciary duty. The jury was instructed that:

[a] "fiduciary duty" arises from a confidential relationship or when a relationship of trust is placedby [sic] one in another and the one relies on and acts on the representations of the other. Where this relationship of confidence or trust exists, a duty rests on the party in whom the confidence or trust is placed, in entering into any transaction with the other, to make a full disclosure of the other's rights in the transaction and a full disclosure of all material facts which might affect the other's decision whether to enter the transaction and to refrain from abusing the confidence or

trust by obtaining an advantage to himself at the expense of the confiding or trusting party. The jury was then asked in special question 3 as to whether a "fiduciary relationship" existed between the Crims and Navistar. If they answered special question 3 affirmatively, the jury was then asked whether Navistar had breached its "fiduciary duty" to the Crims "in connection with the termination of [the Crims'] franchise" in special question 4. Conditioned upon an affirmative response to question 4, special question 5 inquired as to whether the breach of fiduciary duty by Navistar was "made consciously and willfully, or with gross indifference and reckless disregard" for the Crims' rights. Navistar objected to this submission on the grounds that "as a matter of law, there is no fiduciary relationship" between the parties and "there is no evidence that there is or was a fiduciary relationship" between the parties.

*Gas & Equip. Co. v. Thompson,* 405 S.W.2d 333, 336 (Tex.1966); *Thigpen v. Locke,* 363 S.W.2d 247, 253 (1962). Every contract includes an element of confidence and trust that each party will faithfully perform his obligation under the contract.[5] Neither is the fact that the relationship has been a cordial one, of long duration, evidence of a confidential relationship.[6] *See Thigpen,* 363 S.W.2d at 253.

■ Travis Crim testified that he believed the relationship with Navistar was one of mutual trust and confidence. However, "mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship." *Thigpen,* 363 S.W.2d at 253. Further, the Crims point to language in the contract which they claim articulates a special trust and confidence between these parties beyond that ordinarily found in a contract.[7] We are unpersuaded that this language was ever intended to inject an element of personal trust and confidence above and be-

5. The majority of other jurisdictions have rejected the imposition of general fiduciary duties on the franchise relationship. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 485 (5th Cir.1984) (applying Louisiana law); *Bain v. Champlin Petroleum Co.,* 692 F.2d 43, 48 (8th Cir.1982) (applying South Dakota law); *Murphy v. White Hen Pantry Co.,* 691 F.2d 350, 354–55 (7th Cir.1982) (applying Wisconsin law); *Carter Equip. Co. v. John Deere Indus. Equip. Co.,* 681 F.2d 386, 390 (5th Cir.1982) (applying Mississippi law); *Coca–Cola Bottling Co. v. Coca–Cola Co.,* 696 F.Supp. 57, 74–75 (D.Del.1988); *General Business Mach. v. National Semiconductor Datachecker/DTS,* 664 F.Supp. 1422, 1425–26 (D.Utah 1987); *Power Motive Corp. v. Mannesmann Demag Corp.,* 617 F.Supp. 1048, 1051–52 (D.Colo.1985) (applying Ohio law); *Picture Lake Campground, Inc. v. Holiday Inns, Inc.,* 497 F.Supp. 858, 869 (E.D.Va.1980); *Newark Motor Inn Corp. v. Holiday Inns, Inc.,* 472 F.Supp. 1143, 1151–53 (D.N.J.1979); *Weight Watchers of Quebec Ltd. v. Weight Watchers Int'l Inc.,* 398 F.Supp. 1047, 1053–54 (E.D.N.Y.1975). Several of those jurisdictions that have rejected imposition of general fiduciary duties in this context have also recognized that fiduciary duties may independently arise because of the nature of the relationship of the parties without regard to the underlying contract between the parties. *Carter Equip. Co.,* 681 F.2d at 390–91; *Coca–Cola Bottling Co.,* 696 F.Supp. at 74–75; *General Business Mach.,* 664 F.Supp. at 1425–26. Others have recognized an implied contractual duty of good faith and fair dealing in franchise agreements arising out of a general duty of good faith and fair dealing implied in all contracts. *Cambee's Furniture, Inc. v. Doughboy Recreational, Inc.,* 825 F.2d 167, 171 (8th Cir.1987); *Domed Stadium,* 732 F.2d at 485; *Bain,* 692 F.2d at 48; *Murphy,* 691 F.2d at 355; *Coca–Cola Bottling Co.,* 696 F.Supp. at 75; *ABA Distrib., Inc. v. Adolph Coors Co.,* 542 F.Supp. 1272, 1285–86 (W.D.Mo.1982); *Picture Lake Campground, Inc.,* 497 F.Supp. at 869; *Newark Motor Inn Corp.,* 472 F.Supp. at 1151. We, however, have specifically rejected the implication of a general duty of good faith and fair dealing in all contracts. *English v. Fischer,* 660 S.W.2d 521, 522 (Tex. 1983). In any event, a breach of this contractual duty of good faith and fair dealing gives rise only to a cause of action for breach of contract and does not give rise to an independent tort cause of action. *Picture Lake Campground, Inc.,* 497 F.Supp. at 869.

6. The dissent in the court of appeals cites testimony from Travis Crim that "he and his father had always done the things requested by the Franchisor...." 791 S.W.2d at 247. The record reveals that the Crims followed the requests made by the franchisor on two occasions. The first instance occurred in 1947, when the elder Crim moved the dealership location and built a prototype building suggested by International Harvester. Travis Crim testified that the building and land remained the property of his family. Additionally, several years earlier the Crims purchased computer software recommended by International Harvester. We find nothing extraordinary about these requests in the context of the franchise agreement. But, this is not evidence of a confidential relationship.

The dissent also points to the fact that Navistar's predecessor had held out the Crims as an excellent dealership with whom they hoped to continue a long and fruitful relationship. *Id.* This is based on events that occurred in 1947 during the "grand opening" of the new dealership facility. On that occasion, International Harvester purchased an ad in an area newspaper congratulating the Crims on their new building and complimenting them on their performance. Likewise, this one occurrence thirty-eight years prior to termination of the franchise agreement is no evidence of a confidential relationship.

7. The "General Provisions" section of the contract between the parties contains paragraph 34, which beside a margin notation of "Parties Bound, Effect of Partial Invalidity and Assignment" (emphasis supplied), provides in part:

This is a personal agreement, involving mutual confidence and trust, and it may not be assigned by either party without the written consent of the other party, except that [Navistar] may, however, assign the agreement to any of its subsidiary or affiliated corporations, without the consent of the [Crims].

yond that which is ordinarily contemplated by parties to contracts of this type.

As a general rule, all contracts are assignable. *Cloughly v. NBC–Bank–Seguin, N.A.,* 773 S.W.2d 652, 655 (Tex. App.—San Antonio 1989, writ denied); *Kirby Forest Indus., Inc. v. Dobbs,* 743 S.W.2d 348, 354 (Tex.App.—Beaumont 1987, writ denied); *see also* Tex.Bus. & Com.Code § 2.210. An exception to this rule is that a contract that relies on the personal trust, confidence, skill, character or credit of the parties, may not be assigned without the consent of the parties. *Southern Community Gas Co. v. Houston Natural Gas Corp.,* 197 S.W.2d 488, 489–90 (Tex.Civ. App.—San Antonio 1946, writ ref'd n.r.e.); *see also Moore v. Mohon,* 514 S.W.2d 508, 513 (Tex.Civ.App.—Waco 1974, no writ). "Rights arising out of a contract cannot be transferred if they involve a relation of personal confidence such that the party whose agreement conferred those rights must have intended them to be exercised only by him in whom he actually confided." *Mohon,* 514 S.W.2d at 513. The Crims' reliance on the cited contract language as evidence of a confidential relationship is misplaced. Such "boiler plate" language is designed to give the parties some degree of control over with whom they do business, and nothing more. This language was obviously intended to render the franchise agreement unilaterally unassignable.

Alternatively, the Crims urge us, at the very minimum, to impose a common law fiduciary duty on franchisors in the termination of franchise agreements.[8] However, we find imposition of a common law duty unnecessary under the current statutory scheme controlling this aspect of the franchise relationship. In the most recent amendments to the Texas Motor Vehicle Commission Code, the Legislature has undertaken to regulate many aspects of the relationship at issue here. *See* Tex.Rev. Civ.Stat.Ann. art. 4413(36) § 5.02 (Vernon Supp.1991).[9] Wrongful termination of a motor vehicle dealership franchise agreement is now governed by the Texas Motor Vehicle Commission Code. *See id.* A person who has sustained damages as a result of a violation of these provisions may bring suit under the Texas Deceptive Trade Practices—Consumer Protection Act. Tex.Rev. Civ.Stat.Ann. art. 4413(36) § 6.06 (Vernon Supp.1991). Additionally, since 1956, Congress has imposed a duty of good faith in terminating automobile franchise agreements. 15 U.S.C. §§ 1221–1225 (1988). The federal statute is designed to supplement state common law and statutory rights and duties. *Id.* § 1225. We see no good reason to add to the existing regulatory scheme by implication of a common law fiduciary duty.

The Crims, in their cross-points in this court, argue that the damages awarded by the jury for mental anguish, loss of investment and as punitive damages are supported by the jury's findings on the fraud issues, as well as breach of fiduciary duty. The court of appeals found no evidence of a misrepresentation, observing that the only misrepresentations claimed are the terms of the contract themselves. 791 S.W.2d at 245. We agree with the court of appeals.

8. Amici Curiae, Texas Automobile Dealers Association, National Automobile Dealers Association, and Southwest Association (the Associations), urge us to engraft a tort duty of good faith and fair dealing into all franchise agreements. They contend that the franchisee/franchisor relationship should be deemed a special relationship because of the franchisor's disproportionate bargaining power and control inherent in the typical franchise agreement. We disagree. We find no evidence in this case that the franchisor exerted control over its franchisee's business comparable to that exerted by an insurer over its insured's claim. *See Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477, 481 (Tex. App.—Corpus Christi 1989, writ denied). The Associations argue that significant abuse of power and control by franchisors will go unredressed unless a common law duty of good faith and fair dealing is engrafted into franchise agreements by law. Under the current statutory scheme in effect today these concerns are unfounded.

9. Those portions of the amendments regulating franchise termination or nonrenewal became effective June 16, 1989, and thus are inapplicable to the termination in the present case which occurred April 1, 1985 and the suit subsequently filed based thereon in 1987.

As a general rule, the failure to perform the terms of a contract is a breach of contract, not a tort. *See International Printing Pressmen & Assistants' Union of N. Am. v. Smith,* 145 Tex. 399, 198 S.W.2d 729, 735–36 (1946). However, when one party enters into a contract with no intention of performing, that misrepresentation may give rise to an action in fraud. *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex.1986); *Stanfield v. O'Boyle,* 462 S.W.2d 270, 272 (Tex.1971); *Lone Star Steel Co. v. Scott,* 759 S.W.2d 144, 155 (Tex.App.—Texarkana 1988, writ denied). But, a party's failure to perform a contract, standing alone, is no evidence of that party's intent not to perform at the time the contract was made. *Spoljaric,* 708 S.W.2d at 435. A review of this record reveals that there is no evidence that Navistar did not intend to perform the terms of the contract at the time it was made in 1979.

For these reasons, we affirm the judgment of the court of appeals remanding the case to the trial court for a new trial only on the contract and related damage issues.

Dissent by MAUZY, J., joined by DOGGETT and GAMMAGE, JJ.

MAUZY, Justice, dissenting.

The dissenting opinion of July 24, 1991, is withdrawn, and the following is substituted in its place.

Once again wrongfully disregarding a jury verdict, the court has rejected vital protection for Texas businesses. Ignoring a long-standing contract and the circumstances surrounding it, the court abandons motor vehicle dealers and other small businesses across the state to the whims of powerful franchisors. These massive enterprises are invited to enter our state and abuse local businesses without fear of reproach from Texas courts. Today's decision leaves Texas franchisees with less protection than they would have in virtually any other jurisdiction.

This court has long recognized that "where one person trusts in and relies upon another," the relationship between the two may give rise to a fiduciary duty. *Fitz-*

*Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 261 (1951). As the court notes today, the existence of an informal fiduciary relationship, or "confidential" relationship, is usually a question of fact. At 594. What sort of evidence, then, might tend to establish a confidential relationship?

—the fact that one businessman trusts another, and relies upon his promise to perform a contract? No, the court says today; one may trust another implicitly, and stake a lifetime of earnings on the other's promise, but that is still no evidence of a confidential relationship.

—the fact that the relationship has been a cordial one, of long duration? No, says the court; businesses might interact on the best of terms for a century, but that would still not be any evidence of trust and confidence.

—express contractual language stating that the relationship is one involving mutual confidence and trust? No, says the court; regardless of what the parties thought, that language indicates only unassignability, which has nothing to do with trust and confidence.

To reach these bizarre conclusions, the court misrepresents important precedents, and then misapplies them to the facts of this case. The court relies heavily on *Thigpen v. Locke,* 363 S.W.2d 247 (Tex.1962), to establish that nothing in the present case suggests the existence of a confidential relationship. In that case, though, the court was careful to limit the scope of its holding:

All we hold is that [plaintiffs] do not testify to facts—other than their own subjective feelings—which show that their relationship with [defendant] was anything more than a debtor-creditor relationship.

363 S.W.2d at 253. At the time of the conveyance disputed in *Thigpen,* the parties had known each other for less than four years. Nonetheless, the court cites *Thigpen,* 363 S.W.2d at 253, for the proposition that "the fact that the relationship has been a cordial one, *of long duration,*

[is not] evidence of a confidential relationship." At 595 (emphasis added). I challenge anyone to find anything on the referenced page that supports the proposition for which it is cited.

Similarly, the court misrepresents the import of *Consolidated Gas & Equipment Co. v. Thompson,* 405 S.W.2d 333, 336 (Tex.1966). The court relies on that case without even referring to its reasoning. The *Thompson* opinion does not indicate the duration of the parties' relationship; rather, it cites *Thigpen* and other cases, and then explains them as follows:

> Our holdings above cited are to the effect that for a constructive trust to arise there must be a fiduciary relationship before, and apart from, the agreement made the basis of the suit. Such is our holding here.

405 S.W.2d at 336. The court's failure today to explain *Thompson* is understandable: the parties in the present case had a relationship of trust and confidence for fifteen years before the franchise agreement made the basis of this suit.

The court then explains away some of the contract's most important language. Parties may agree, in writing, that their relationship is one of mutual confidence; but even so, the court decides, they don't really mean it. Offering no authority for disregarding such language, the court also disregards longstanding rules that a contract should be construed in accordance with its plain language, *General American Indemnity Co. v. Pepper,* 161 Tex. 263, 264, 339 S.W.2d 660, 661 (1960), and that a writing is construed most strictly against its author, *Republic National Bank v. Northwest National Bank,* 578 S.W.2d 109, 115 (Tex.1979). By simply dismissing this language as "obviously intended to render the franchise agreement unilaterally unassignable," at 596, the court misses an equally obvious point: the unassignability of the agreement plainly indicates a confidential relationship. If there were no trust and confidence involved, why would a party care whether the agreement was assignable? A nonassignability clause may not conclusively establish the existence of a confidential relationship; but surely it is

some evidence of trust and confidence. *See Carter Equip. Co. v. John Deere Indus. Equip. Co.,* 681 F.2d 386, 391 (5th Cir.1982) ("[T]he nature of the agreement between the parties may provide evidence that a fiduciary relationship exists.").

The Crims presented a wealth of evidence indicating that their forty-three-year relationship with Navistar was, in fact, one of trust and confidence. After a fifteen-year relationship based solely on trust—the parties working together without any written contract—the Crims continued to trust their franchisor, and to do its bidding. Travis Crim testified that he maintained his faith in Navistar partly because of the franchise provision that "[t]his is a personal agreement involving mutual confidence and trust...."; without which language, Crim testified, he would not have signed the franchise agreement. After the Crims built a prototype building in a new location at Navistar's direction, Navistar placed a newspaper ad describing this structure as a symbol of "good faith and permanency in the progressive community of Henderson, Texas." Tim Farley testified that the termination of the franchise agreement by Navistar "broke" his "trust in them." Dick Ettle, a Navistar Area Sales Manager, testified that he did not recall the Crims ever refusing to do anything that he asked of them. Travis Crim testified that the Crims carried every line of Navistar product offered to them.

After hearing all of the evidence, the jury determined that a fiduciary relationship existed between Navistar and the Crims. In reviewing that determination on a no evidence point of error, this court must consider only the evidence and inferences tending to support the jury verdict, and disregard all evidence to the contrary. *International Bank, N.A. v. Morales,* 736 S.W.2d 622, 624 (Tex.1987); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1952). When there is more than a scintilla of evidence, an appellate court may not overturn the jury's finding on a no evidence point of error. *Sherman v. First*

*Nat'l Bank,* 760 S.W.2d 240, 242 (Tex. 1988).

The court today fails to give due consideration to the evidence supporting the jury verdict; indeed, the court does not even bother to mention much of that evidence. The court simply presents selected facts, assigning weight to those according to its own inclinations. In doing so, the court assumes for itself the job which the trial court properly assigned to twelve jurors.[1] I would uphold the jury's finding of a fiduciary relationship.

I would also hold that these facts indicate the existence of a "special relationship" between the franchisor and the franchisee. The court correctly notes that we have, in the past, recognized certain relationships as "special relationships," and that those relationships give rise to a tort duty of good faith and fair dealing. Pages 593–594 (citing *Aranda v. Insurance Co. of N. Am.,* 748 S.W.2d 210, 212–13 (Tex. 1988); *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex. 1987)). The court concludes that there is no special relationship because there is no evidence that Navistar exerted control over the Crims' business "comparable to that exerted by an insurer over its insured's claim." Page 596 n. 8. I disagree.

In *Arnold,* we held that a special relationship between an insurer and its insured arises out of the parties' unequal bargaining power and the exclusive control the insurer has over the evaluation, processing and denial of claims. *Id.* at 167. We recognized that the nature of the contract itself allows unscrupulous carriers to take advantage of the insured in bargaining for the settlement of claims. As a result, we held that a duty of good faith and fair dealing exists in an insurer-insured relationship. *Id.*

Here, there is ample evidence of Navistar's overwhelming bargaining power and exclusive control over its franchisees. The 1979 franchise agreement contains the following provisions which, individually and collectively, show the imbalance in bargaining power:

(1) Navistar may add or eliminate truck models without incurring liability to the Crims.

(2) Navistar has unilateral control over what orders it will accept from the Crims.

(3) Only under very limited circumstances can the Crims cancel their order for products from Navistar.

(4) Navistar can retroactively modify the price and the terms of an order from the Crims *after* the Crims have placed the order.

(5) The Crims must pay Navistar for all expenses incurred by Navistar in shipping and handling the products to the Crims.

(6) Navistar has the right to add the cost of company advertising to the Crims' prices.

(7) Navistar expressly reserves the right to compete with the Crims for major sales accounts in the Crims' own designated trade areas.

(8) Navistar reserves the right to change the specifications and design of any product and requires the Crims to accept that modified product in fulfillment of existing orders.

(9) The Crims are not allowed to change the location of their retail establishment without Navistar's approval.

(10) Navistar controls the content and quality of the Crims' advertising activities.

(11) Navistar shifts all risks for transportation charges and losses during transportation to the Crims.

(12) The Crims bear the risk of any credit transactions with Navistar by Navistar's contractual right to retain unilateral discretion over all credit terms extended to the Crims.

(13) The Crims must provide a service center and a building to sell and service Navistar's products. These include service tools, equipment, shop space, service library, parts

---

1. This is not the first time that this majority has usurped the role of the jury. *See, e.g., Greater*

*Houston Transportation Co. v. Phillips,* 801 S.W.2d 523 (Tex.1990).

bins and equipment, and office furniture and equipment.

(14) The Crims must, at their own risk and expense, hire and train service, sales, and accounting personnel to service and sell Navistar's products.

Travis Crim testified that he had no input on the wording of the franchise agreement. He stated that "We either signed it, or we did not have a contract."

In refusing to recognize a special relationship in this case, the court demonstrates a disturbing degree of judicial myopia. In my view, the agreement between Navistar and the Crims is exactly the type of relationship envisioned in *English v. Fischer*, 660 S.W.2d 521, 524–25 (Tex.1983) (Spears, J., concurring). In *English*, this court refused to find an implied duty of good faith and fair dealing in every contract. However, the concurrence recognized that there may be relationships in which the duty of good faith and fair dealing "springs from the relationship, not from the contract." *Id.* at 525. This is one of those relationships.

Franchise agreements like the one at issue here are take-it-or-leave-it propositions for franchisees. A dealer cannot, through negotiation, materially change the risks and burdens placed on him by the manufacturer. The power of the franchisor is overwhelming, and its control over the relationship is exclusive. It was that same imbalance of power that led Congress to enact the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225 (1988). Legislative history shows that Congress passed the Act in recognition of the unequal bargaining power of franchisors and franchisees. *See* H.R.Rep. No. 2850, 84th Cong., 2nd Sess., *reprinted in* 1956 U.S.Code Cong. & Ad.News 4596, 4597. *See also Woodard v. General Motors Corp.*, 298 F.2d 121, 127–28 (5th Cir.), *cert. denied*, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962).

I cannot ignore the provisions of this one-sided agreement and allow the resulting abuse that is apparent from the record in this case. The dissent in the court of appeals advocated that a good faith and fair dealing requirement should exist for the termination of franchise agreements. 791 S.W.2d 241, 249 (Grant, J., dissenting). At a minimum, I would hold that there is an implied duty of good faith and fair dealing in this franchise agreement between Navistar and Crim.

Other courts throughout the nation have recognized the immense power wielded by franchisors, and have developed their law so as to afford some protection to franchisees. *See Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736, 742 (1978) ("The weight of commentary has argued in favor of judicial recognition that the nature of a franchise agreement imposes a duty upon franchisors not to act arbitrarily in terminating the franchise agreement.") A number of courts have held that obligations of good faith and fair dealing prevent a franchisor from terminating a franchise agreement without cause. *See, e.g., Cambee's Furniture v. Doughboy Recreational, Inc.*, 825 F.2d 167, 172–73 (8th Cir.1987); *Bain v. Champlin Petroleum Co.*, 692 F.2d 43, 48 (8th Cir.1982); *Arnott v. American Oil Co.*, 609 F.2d 873 (8th Cir.1979); *Atlantic Richfield v. Razumic*, 390 A.2d at 742; *Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973). Other courts have held that a franchise relationship may give rise to fiduciary duties in the context of dealership termination. *See, e.g., Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir.1984); *Murphy v. White Hen Pantry Co.*, 691 F.2d 350 (7th Cir.1982); *Coca-Cola Bottling Co. v. Coca-Cola Co.*, 696 F.Supp. 57, 74–75 (D.Del.1988); *Gen. Business Machs. v. Nat'l Semiconductor Datachecker/DTS*, 664 F.Supp. 1422, 1425 n. 4 (D.Utah 1987); *Newark Motor Inn Corp. v. Holiday Inns, Inc.*, 472 F.Supp. 1143, 1152 (D.N.J.1979); *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d at 742.

To make its decision seem within the mainstream of American case law, the court cites the foregoing cases and others for a proposition no one disputes: "The majority of other jurisdictions have rejected the imposition of general fiduciary duties on the franchise relationship." Page 595 n. 5. As the court itself recog-

nizes, the Crims do not suggest that this court impose general fiduciary duties on the franchise relationship. Rather, the Crims argue that the evidence in this case supports the conclusion that a confidential relationship existed, and alternatively that a fiduciary relationship should be recognized where a franchisor has wrongfully terminated the franchise agreement. Both of those arguments are consistent with every one of the cases the court cites.

In contrast, the court's decision today is fundamentally at odds with most of the cases it cites, at least insofar as the court completely rejects the Crims' arguments. For instance, in *Carter Equip. Co. v. John Deere Indus. Equip. Co.*, 681 F.2d 386 (5th Cir.1982), the court recognized that relationships like the one at issue here may be fiduciary in nature.[2] Moreover, of the cases the court cites as rejecting a general fiduciary duty, none reject such a duty in the context of franchise termination; in fact, those that address the issue actually recognize such a duty. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d at 485; *Bain v. Champlin Petroleum Co.*, 692 F.2d at 48; *Murphy v. White Hen Pantry Co.*, 691 F.2d at 354; *Coca–Cola Bottling Co. v. Coca–Cola Co.*, 696 F.Supp. at 74; *Newark Motor Inn Corp. v. Holiday Inns, Inc.*, 472 F.Supp. at 1152.[3] Most state courts addressing the issue have done the same. *See, e.g., Ashland Oil v. Donahue*, 159 W.Va. 463, 223 S.E.2d 433 (1976); *Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598, 601–02 (1973), *cert. denied*, 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974); *Division of the Triple T. Service, Inc. v. Mobil Oil Corp.*, 60 Misc.2d 720, 304 N.Y.S.2d 191 (Sup.Ct.1969), *aff'd mem.*, 34 A.D.2d 618, 311 N.Y.S.2d 961 (1971).

The court justifies its departure from the vast majority of jurisdictions on the ground that this court in *English v. Fischer* rejected the implication of a general duty of good faith and fair dealing in all contracts. Page 595 n. 5. That decision came only four years after the adoption of section 205 of the Restatement (Second) of Contracts, which provides that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." While at that time the five-judge majority in *English v. Fischer* viewed the concept embodied in section 205 as "a novel theory of law enunciated only by California courts," 660 S.W.2d at 522, we now know the rule has become so well-established as to be considered "hornbook law." *Newark Motor Inn Corp. v. Holiday Inns, Inc.*, 472 F.Supp. at 1151; *see also* 5 Williston on Contracts § 670 (3d ed. 1961). Continued repudiation of section 205 is contrary to efforts to bring coherence and uniformity to American law. I would join the rest of our nation's courts in implying a duty of good faith and fair dealing in all contracts, including franchise agreements.

In addressing whether to impose a fiduciary duty on franchisors in the termination of franchise agreements, the court finds "no good reason to add to the existing regulatory scheme by implication of a common law fiduciary duty." Page 596. The court notes that after June 16, 1989, the wrongful termination of a motor vehicle dealership franchise agreement is governed by the Texas Motor Vehicle Commission Code (TMVCC). Since this suit was filed before that time, the Crims did not have the benefit of this statutory remedy.

---

**2.** In addition to the goals of the parties and the requisite need for trust or confidence in one another, the nature of the agreement between the parties may provide evidence that a fiduciary relationship exists. If the franchisor has power to control the franchisee, there is an increased likelihood that a fiduciary relationship exists, since trust or confidence necessarily must flow from the controlled or dominated party. As a result, the power, authority, and bargaining position of *both* the franchisor and franchisee becomes critical.

681 F.2d at 391. *See also Gen. Business Machs. v. Nat'l Semiconductor Datachecker/DTS*, 664 F.Supp. 1422, 1425 (D.Utah 1987) ("This court concludes that a material issue of fact exists with regard to whether a fiduciary relation existed as a result of the dealership agreement and the course of dealing between the parties.").

**3.** *See also ABA Distrib., Inc. v. Adolph Coors Co.*, 542 F.Supp. 1272, 1285–86 (W.D.Mo.1982); *Arnott v. American Oil Co.*, 609 F.2d at 876.

Moreover, the legislature's treatment of the franchise relationship hardly requires this court to blind itself to that nature of that relationship. *Compare Arnott v. American Oil Co.*, 609 F.2d at 883 ("[F]urther indication of the fiduciary nature of a franchise relationship is found in the recent surge of general franchise legislation.").

The court would also have the Crims believe that they could have been aided by the Automobile Dealers' Day in Court Act (ADDCA), 15 U.S.C. §§ 1221–1225 (1988), in which Congress has imposed a duty of good faith in terminating automobile franchise agreements. Case law under the ADDCA, however, holds that the Act does not protect the dealer from mere "arbitrary" or bad faith conduct. Coercion or intimidation is needed to show a lack of good faith under the Code's stricter definition of "good faith." *See Overseas Motors, Inc. v. Import Motors Ltd., Inc.*, 519 F.2d 119, 125 (6th Cir.1975), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975) [other cites moved to footnote].[4]

The termination in this case was arbitrary. Rex Templeton, Finance Planning Manager for Navistar, testified that not all dealers who failed to sign the agreement to purchase the new computer system were terminated. In fact, there is no specific evidence in the record of this case of any other dealer of Navistar products being terminated for failure to purchase the computer system except for the Crims. Virgil Nelson, a retired Navistar Contracts Manager, testified at trial, a full three years after the Crims were terminated for not agreeing to purchase the computer system, that Navistar still had not provided its dealers with the forms necessary for the dealers to use the computers to order inventory and products. Both Nelson and Templeton, as well as Navistar dealer Al Pliler, testi-

fied that Navistar still had dealers using the same written forms that the Crims were using when terminated in 1985. Nelson testified that fifty percent of the dealers were not using the computer system to place orders.

The Crims did not plead coercion or intimidation. On the contrary, the Crims contended and proved to the jury that this action was a wrongful termination by Navistar. Thus, there is no evidence in the record to suggest that the Crims could have availed themselves of the protections provided by the ADDCA. The fact that Congress eventually recognized, by enactment of legislation, the same disparity of bargaining power that gives rise to this action is twisted by the court to justify its inequitable result. Although the Crims can in no way utilize ADDCA, the court relies on it to reject their claim.

Because the court today fails completely to give due recognition to imbalances of power in business relationships, I strongly dissent. I would reverse the judgment of the court of appeals and remand this cause to that court for consideration of the factual insufficiency points.

DOGGETT and GAMMAGE, JJ., join in this dissenting opinion.

**4.** *See also Woodard v. General Motors Corp.*, 298 F.2d 121, 127–28 (5th Cir.), *cert. denied*, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962); *Hubbard Chevrolet Co. v. General Motors Corp.*, 873 F.2d 873 (5th Cir.), *cert. denied*, 493 U.S. 978, 110 S.Ct. 506, 107 L.Ed.2d 508 (1989); *Kotula v. Ford Motor Co.*, 338 F.2d 732, 739 (8th Cir.1964), *cert. denied*, 380 U.S. 979, 85 S.Ct. 1333, 14 L.Ed.2d 273 (1965); *Dreiling v. Peugeot Motors*, 850 F.2d 1373, 1379 (10th Cir.1988); *Victory Motors of Savannah, Inc. v. Chrysler Motors*, 357 F.2d 429 (5th Cir.1966); *Berry Bros. Buick, Inc. v. General Motors Corp.*, 257 F.Supp. 542, 546 (E.D.Pa.1966), *aff'd*, 377 F.2d 552 (3d Cir.1967); *McDaniel v. General Motors Corp.*, 480 F.Supp. 666 (E.D.N.Y.1979), *aff'd*, 628 F.2d 1345 (2d Cir.1980); *Sink v. Ford Motor Co.*, 549 F.Supp. 245, 249 (E.D.Mich.1982); *Unionvale Sales Ltd. v. World–Wide Volkswagen Corp.*, 299 F.Supp. 1365, 1367 (S.D.N.Y.1969).